UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

THOMAS GREEN,

Plaintiff,

v.          408CV068

RELIANCE STANDARD LIFE INSURANCE COMPANY,

Defendant.

## ORDER

### I. BACKGROUND

Plaintiff Thomas Green brought this action under ERISA seeking review of the denial of long-term disability ("LTD") benefits. Doc. # 1 at 4-7. Green was covered under an employee welfare benefit plan (the "Plan") issued by Reliance Standard Life Insurance Company ("Reliance Standard") to Green's former employer CEC Entertainment Concepts, L.P. ("CEC Entertainment" a.k.a. "Chuck E Cheese"). Green was previously employed as a General Manager at a Chuck E Cheese restaurant and arcade. Doc. # 19 at 1. After undergoing a bilateral knee replacement operation, he began to receive LTD benefits under the Plan on 7/29/06. On 3/26/07 Reliance Standard terminated his LTD benefits after concluding that he no longer met the definition of "Totally Disabled" under the Plan. *Id.* at 2. Green appeals to this Court for a review of Reliance Standard's decision to deny benefits.

### A. The Plan Language and Construction

The Plan states that Reliance Standard will provide LTD coverage in the event that Green becomes "Totally Disabled," which it defines to mean, "as a result of an Injury or Sickness[,] ... an Insured cannot perform the material duties of his/her Regular Occupation." Doc. # 19-2 at 18, 10. The Plan also defines "Regular Occupation" as "the occupation the Insured is routinely performing when Total Disability begins." *Id.* at 10. To that, the Plan adds the qualifier, "We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for the specific employer or in a specific locale." *Id.* at 10. Finally, the Plan gives Reliance Standard "discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits," and requires that the insured submit "satisfactory proof" of total disability to Reliance Standard. *Id.* at 14, 18.

The dispute between the parties centers around the proper definition of Green's "regular occupation" and the relevant duties therein. Green insists that Reliance Standard should have relied on the job description that Chuck E Cheese provided to it to define his occupation. Doc. # 21 at 5. Instead, Reliance Standard turned to the Dictionary of Occupational Titles (DOT) published by the Department of Labor to identify Green's occupation. Doc. # 23 at 2. The DOT contains both a description of and the physical demands associated with each occupation. Reliance Standard determined that Green's job was captured by two DOT occupations: "Manger, Fast Food Services" and "Manager, Recreation Facility." Doc. # 19-3 at 60. It then compared the physical demands of those two DOT occupations with Green's physical

limitations to determine if he was disabled from performing his occupation. Importantly, some of the physical limitations Green claimed – kneeling, bending and squatting – are listed as "qualifications" in the Chuck E Cheese job description, but are not listed as physical demands of the two selected DOT titles.

**B. Medical and Claims History**

Green's relevant medical history begins with his 5/10/06 bilateral knee replacement surgery. Doc. # 19-2 at 79. Two months after his surgery, on 7/13/06, Green met with his orthopedic surgeon, Dr. Charles Hope, M.D., for a follow-up examination. *Id.* at 68. At that time, Dr. Hope noted that Green was pleased with his pain relief and progress and cleared Green to return to light duty work at Chuck E Cheese. *Id.* Shortly thereafter, on 7/29/06, Green began to receive LTD benefits from Reliance Standard.

On 7/31/06, Green returned to Dr. Hope for an unscheduled visit complaining of an inability to perform his duties at work, specifically noting that his duties required frequent squatting and kneeling. *Id.* at 80. Dr. Hope recommended that Green stop working for the time being and scheduled a re-evaluation for September.

When Green next saw Dr. Hope on 9/28/06, Green said he was not sure he could get back to his regular duties yet. *Id.* at 79. Dr. Hope noted that Green was in no acute distress, walked without evidence of a limp and without assistive devices, and had a range of motion that was smooth and largely pain free. *Id.* Dr. Hope concluded that Green could return to sedentary, light-duty work but believed that such work was not realistic at Chuck E Cheese. *Id.*

Following Green's next visit, on 12/1/06, Dr. Hope reported that Green had experienced improvement with both pain and motion but that he could not return to his previous position as it involved quite a bit of squatting, kneeling, and ladder-climbing. Doc. # 21-2 at 3. He concluded, "At this point, we feel it is unlikely that [Green] would be able to return to his previous employment. His condition may require consideration for career change to something less strenuous." *Id.* Dr. Hope referred Green for a functional capacity exam ("FCE") to better identify his abilities and limitations. *Id.*

Midtown Physical Therapy performed the FCE on 1/9/07. Doc. # 19-3 at 48-52. The FCE report concluded that Green demonstrated a tolerance for most medium duty activities as well as some heavy duty activities. *Id.* at 48. He was able to perform activities while standing throughout the hour-long FCE, was able to walk one mile as requested, and could climb stairs without using a handrail. *Id.* at 48, 51. However, the FCE report concluded that Green could not safely climb a ladder and that Green was unable to crouch, crawl, and kneel. *Id.* at 48.

Dr. Hope reviewed the FCE results and concluded that Green "has recovered well enough for office type jobs but will not be able to tolerate prolonged standing, walking or any kneeling or squatting." Doc. # 21-2 at 4. A Reliance Standard medical specialist then reviewed the FCE results and acknowledged that Green was unable to climb ladders safely, kneel, or maintain a squat. Doc. # 19-3 at 7. The medical specialist opined that Green was capable of light work subject to these limitations. *Id.*

On 3/14/07 a Reliance Standard vocational specialist reviewed Green's file. *Id.* at 61-62.

The vocational specialist relied on the DOT and concluded that two occupational titles – Manager, Fast Food Services, and Manager, Recreation Facility – were necessary to capture the nature and scope of Green's position. *Id.* at 61. The vocational specialist concluded that Green had no restrictions or limitations that would prevent him from performing his "regular occupation" as defined by those two DOT titles. *Id.* at 61-62. Consequently, Reliance Standard concluded that Green was no longer "Totally Disabled" as defined by the Plan and terminated Green's LTD benefits as of 3/26/07. *Id.* at 7.

Green appealed this determination through Reliance Standard's internal appeals process. *Id.* at 66. With his appeal, Green submitted a letter from Dr. Hope which opined that Green could not perform his prior occupation with Chuck E Cheese due to the required long hours on his feet. *Id.* at 67. Reliance Standard forwarded Green's file for an independent review on 12/6/07 to Dr. Jeffrey Middledorf, D.O., a specialist in physical medicine and rehabilitation and pain management. *Id.* at 74-75. Dr. Middledorf concluded that Green "would be able to function at the medium level of occupation, including exerting 20 to 50 pounds frequently, with no limits on sitting, standing, or walking, with the restrictions of no kneeling, crawling, crouching or prolonged squatting." *Id.* at 74.

Following Dr. Middledorf's review, Reliance Standard enlisted a vocational specialist to conduct a second occupational review. *Id.* at 80-81. The vocational specialist again concluded that Green could perform the material duties of his regular occupation as defined by the two DOT titles. *Id.* at 80-81. Reliance Standard upheld its discontinuation of LTD benefits and informed Green of its decision on 1/14/08. *Id.* at 4-9.

Green appealed Reliance Standard's denial of LTD benefits to the Superior Court of Chatham County, and Reliance Standard removed the appeal to this Court pursuant to ERISA's civil enforcement statute, 29 U.S.C. § 1132(e). Doc. # 1.

II. **STANDARD OF REVIEW**

Although this case comes before the Court as a motion for summary judgment, the F.R.Civ.P. 56(c) summary judgment standard "is incongruent with the ERISA standard of review." *Murray v. Hartford Life & Accident Ins. Co.*, --- F. Supp. 2d ----, 2009 WL 1635332, at *7 (M.D. Fla. 6/11/09); *see also Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272-73 (M.D. Fla. 2006) (discussing interplay between ERISA review and summary judgment standards). "In an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.*, 2005 WL 894840, at *7 (11th Cir. 2005) (unpublished per curiam opinion) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)); *accord Clark v. Hartford Life & Accident Ins. Co.*, 2006 WL 890660, at *2 (M.D. Fla. 4/6/06) (unpublished opinion).

The text of ERISA does not set forth standards for the district court to apply when reviewing a plan administrator's decision to deny benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Filling this void, the Supreme Court in *Firestone* instructed courts to apply a *de novo* standard of review unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe

the terms of the plan. *Id.* at 115. Furthermore, when an administrator with discretion operates under a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.* (quotes omitted). The Eleventh Circuit has summarized this review process in six steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir. 2004).

Until recently, the heightened arbitrary and capricious standard set forth in *Williams'* "Step Six" required the plan administrator to bear the burden of proving that its decision was not tainted by a conflict of interest. However, the Eleventh Circuit in *Doyle v. Liberty Life Assurance Co. of Boston,* 542 F.3d 1352, 1360 (11th Cir. 2008), abandoned that formulation of the heightened arbitrary and capricious standard in light of *Metro. Life Ins. Co. v. Glenn,* 128 S. Ct. 2343 (2008). *Glenn* held that a reviewing court should consider a conflict of interest as merely "a factor" in determining whether the plan administrator abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case. 128 S. Ct. at 2346. As a result, the Eleventh Circuit held that "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Doyle,* 542 F.3d at 1360.

It is undisputed that the Plan gives Reliance Standard the discretion to make benefits determinations. Furthermore, because Reliance Standard is both the fiduciary responsible for making benefits decisions and also the insurance company responsible for paying the claims, it operates under a conflict of interest. *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1561-62 (11th Cir. 1990).

### III. <u>DISCUSSION</u>

#### A. Regular Occupation

The primary dispute in this case centers on how to define Green's "Regular Occupation."

The parties agree that Green is unable to kneel, crawl, crouch, or maintain a squat. Under the DOT occupational titles selected by Reliance Standard, these abilities are not required to perform the material duties of Green's occupation. On the other hand, Chuck E Cheese's job description for "General Manager" lists the ability to stand, bend, kneel, reach, push/pull, walk, and squat as "qualifications" necessary for that job. Thus, Green's ability to perform his regular occupation hinges on whether his occupation is defined using the DOT descriptions or Chuck E Cheese's description.

Reliance Standard insists that it properly relied on DOT occupational descriptions because the Plan defines occupation "as it is normally performed in the national economy" and does not require Reliance Standard to look at "the unique duties performed for a specific employer or in a specific locale." Doc. # 19-2 at 10. In response, Green points out that courts have previously found Reliance Standard's use of the DOT to define a claimant's occupation on a national level to be improper. He cites to *Shahpazian v. Reliance Standard Life Ins. Co.*, 388 F. Supp. 2d 1368 (N.D. Ga. 2005), which found:

> Reliance Standard seized upon one or more occupation descriptions in the DOT, despite the fact that these descriptions, individually or when blended, did not reflect certain material duties of Plaintiff's position with [his employer] or forensic accountants generally. This enslaved dependence upon the DOT is unreasonable and, in a case like this, creates a risk of unjust results.

*Shahpazian*, 388 F. Supp. 2d at 1379.

Indeed, *Shahpazian* cites to a number of cases rejecting Reliance Standard's use of the DOT's national occupational definitions. *Id.* at 1375-77 (citing *Freling v. Reliance Standard Life Ins. Co.*, 315 F. Supp. 2d 1277 (S.D. Fla. 2004); *Wirries v. Reliance Standard Insurance Co.*, 2005 WL 2138682, at *5 (D. Idaho 9/1/05); *Smith v. Reliance Standard Life Ins. Co.*, 350 F. Supp. 2d 993, 999 (S.D. Fla. 2004); *Lasser v. Reliance Standard Life. Ins. Co.*, 344 F.3d 381, 386 (3d Cir. 2003); *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 735 (S.D. Ohio 2001); *Conrad v. Reliance Standard Life Ins. Co.*, 292 F. Supp. 2d 233, 240-241 (D. Mass. 2003); *Greene v. Reliance Standard Life Ins. Co.*, 2004 WL 2634416, at *1-2 (W.D. Va. 10/26/04).

However, *Shahpazian* and the cases cited therein are distinguishable from Green's claim in that, unlike the language of Green's Plan, the contracts in those cases did not expressly define "Regular Occupation" by using a national standard. *See Shahpazian*, 2005 WL 2375076, at *8 ("The term 'regular occupation' is not defined in the Plan."); *Freling*, 315 F. Supp. 2d at 1287, 1291 ("Reliance's interpretation that the term 'regular occupation' incorporates a 'national standard' was unreasonable" when "regular occupation" was not defined by the policy); *Wirries*, 2005 WL 2138682, at *2 ("own or regular occupation" was not defined in plan); *Smith*, 350 F. Supp. 2d at 999 (concluding that "regular occupation" did not incorporate national standard but should be defined as "what that employee actually does for that employer" where policy did not define the term); *Lasser*, 344 F.3d at 386 ("[I]t is unreasonable for Reliance to define 'regular occupation' [broadly] ... without explicitly including that different definition in the

Policy."); *Ebert,* 171 F. Supp. 2d at 735 ("There is no reason to assume that a national standard set forth in the DOT defines the duties of Plaintiff's regular occupation."); *Greene,* 2004 WL 2634416, at *1-2, *2 n.5 (no mention of any provision in the policy that excluded consideration of the specific employer or location); *see also Becker v. Hartford Life & Accident Ins. Co.,* 2006 WL 1360928, at *7 (M.D. Fla. 5/17/06) (distinguishing *Shahpazian* on basis that plan in that case "did not contain any language excluding consideration of the specific employer or specific location"); *Stiltz v. Metro. Life Ins. Co.,* 2006 WL 2534406, at *8 (N.D. Ga. 8/30/06), *aff'd* 244 F. App'x 260 (11th Cir. 6/5/07) (unpublished) (distinguishing *Shahpazian* on same basis). Thus, while Reliance Standard was not justified in relying on DOT definitions in those cases, their holdings and reasoning cannot be applied to Green's plan which expressly provides that "regular occupation" shall be viewed as performed in the national economy.

Other courts have held that an insurer may rely on DOT occupational titles when a disability plan defines "occupation" broadly. In *Stiltz* the Eleventh Circuit held that an insurer could rely on DOT definitions when the disability plan defined "own occupation" as "not limited to the specific position" held by the plaintiff. 244 F. App'x at 264[1]. In that case, the insurer characterized the plaintiff's occupation as one involving "light-duty work" even though the plaintiff's actual duties may have been more demanding, as the plaintiff was allegedly required to lift 75 pounds, carry 25 pounds, travel frequently, and work 60 to 70 hours per week. *Id.* The court held that the actual requirements of the plaintiff's position were not controlling in light of the plan's broad definition of "regular occupation." *Id.*[2]

District courts in the Eleventh Circuit have similarly approved the use of DOT definitions when a plan defines "occupation" on a national level. In *Becker,* the plaintiff asserted that the assigned DOT occupation of "Manager, Food Services," was inaccurate, outdated, and reflected less strenuous duties than performed in his actual job as a general manager at a large national chain restaurant. 2006 WL 1360928, at *1. He urged the court to require the insurance company to use the job description provided by his employer. *Id.* at *6. Under the terms of his policy, however, "Your Occupation" did not mean a specific job performed for a specific employer or at a specific location. *Id.* at *2. The court held:

> While some consideration of the actual workplace is necessary to ascertain which DOT definition to apply to the particular occupation, the clear terms of the Plan documents in this case neither require compliance with a job for a specific employer nor compliance with a job at a specific location. *See Richards v. Hartford Life & Accident Ins. Co.,* 356 F. Supp. 2d 1278, 1287 (S.D. Fla. 2004) (holding that clear terms of plan documents defining "Your Occupation" as it is recognized in the "general

---

[1] This case is unpublished and is cited as persuasive authority only.

[2] The Court did note that the DOT occupation selected by the insurer was consistent with the general job description provided by the claimant's employer. 244 F. App'x at 264. While the court did not elaborate on the degree to which it affected the court's decision, it does suggest that there may need to be some correlation between a DOT occupation and the actual duties performed by an employer.

6

workplace" and not "the specific job you are performing for a specific employer," permitted situation where person might not be able to perform a specific job assignment, but still perform duties generally understood to be part of his occupation). So long as the employee can perform the general duties of his occupation in a non-employer specific setting, he need not be able to perform each and every particular assignment. *Id.*

*Id.* at *7; *see also Rodriguez v. Liberty Life Assurance Co. of Boston*, 2006 WL 3201871, at *12 (M.D. Fla. 11/3/06) (holding that insurer could use DOT to define plaintiff's occupation instead of relying on actual duties when policy expressly defined "own occupation" as it is normally performed in the national economy."); *Clark v. Hartford Life & Accident Ins. Co.*, 2006 WL 890660, at *4 (M.D. Fla. 4/6/06) (holding that insurer could use DOT's broad definition of "retail store manager" to define grocery store manager's "own occupation" even where plan did not define the term to mean one's occupation as it is generally performed in the labor market.)

Other persuasive authority similarly condones the use of DOT occupational definitions. *See Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006) (use of the DOT to determine plaintiff's "own occupation" was not unreasonable); *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 272 (4th Cir. 2002) (stating that use of a DOT job description is acceptable when the description "involve[s] comparable duties"); *Tsoulas v. Liberty Life Assurance Co. of Boston*, 397 F. Supp. 2d 79, 96 n.17 (D. Me. 2005) ("When the term 'occupation' is undefined, courts properly defer to the DOT definition of the term because insurers issuing disability policies 'cannot be expected to anticipate every assignment an employer might place upon an employee outside the usual requirements of his or her occupation.'") (quoting *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253, 1259 (D. Nev. 2000), *remanded on other grounds*, 33 F. App'x 908, 910 (9th Cir. 2002)), *aff'd*, 454 F.3d 69 (1st Cir. 2006).

In light of the Plan's expansive definition of "Regular Occupation," Reliance Standard was not "*de novo* wrong" to use the DOT to define Green's occupation. To hold otherwise would render meaningless the express language in the contract exempting Reliance Standard from looking at an insured's specific job duties. However, that does not mean that Green's specific job duties are entirely irrelevant. "A general job description of the DOT, to be applicable, must involve comparable duties but not necessarily every duty." *Gallagher*, 305 F.3d at 272; *see also Greene*, 2004 WL 2634416, at *1-2, *2 n.5 (DOT descriptions may be appropriate when "objectively reasonable"); *Becker*, 2006 WL 1360928, at *7 ("[S]ome consideration of the actual workplace is necessary to ascertain which DOT definition to apply to the particular occupation...").

Green contends that the DOT titles selected by Reliance Standard do not accurately reflect his occupation, arguing that the definition of "'fast food manager' ... does not even come close to matching" his actual job duties. Doc. # 21 at 6. The Court might accept that argument if Reliance Standard had relied solely on the DOT definition of fast

7

food manager, but it did not. Finding that no single occupational title in the DOT accurately reflected Green's occupation, Reliance Standard relied on two titles in order to capture Green's duties. To paraphrase the DOT titles, a Fast Food Service Manager oversees preparation of food, collects money, orders supplies, keeps business records, and manages, hires, and trains employees.[3] A Recreation Facility Manager manages an arcade or other recreational facility, coordinates activities of workers, initiates promotional campaigns, handles customer grievances, hires workers to make needed facility repairs, purchases supplies, maintains financial records, and collects coins from arcade machines.[4]

The Court notes that a Chuck E Cheese restaurant serves pizza and contains arcade games and rides for children. *See* Chuck E Cheese – The Experience – Games & Rides, http://www.chuckecheese.com/the-experience/games-rides.php (last visited 7/6/09). Chuck E Cheese's "Position Description" for General Manager states that the "employee will be responsible for recruiting, hiring, training, developing and evaluating Star Cast Members. Supervise and oversee [sic] all phases of store operations to ensure profitability through store presentation, inventory management, customer service, payroll management and daily operational cost control." Doc. # 19-2 at 48. While the Chuck E Cheese and DOT descriptions are not identical, the DOT titles adequately reflect the character of Green's occupation. Thus, the Court concludes that Reliance Standard's definition of Green's "Regular Occupation" was not "wrong" under a *de novo* standard of review.

**B. Disability**

Accepting that Reliance Standard properly relied on the two selected DOT titles, the Court next finds that Reliance Standard rightly concluded that Green was not totally disabled. The record is clear that Green is unable to kneel, crawl, crouch, or squat for prolonged periods of time. While those activities are listed by Chuck E Cheese as "qualifications" for the position of General Manager[5], they are not listed in the relevant DOT titles as physical demands of Green's occupation. The Plan language does not require Reliance Standard to consider the physical demands that are specific to Green's employer, and thus, Reliance Standard appropriately referenced only the physical demands identified in the DOT titles in determining disability.

The parties dispute whether Green is limited in his ability to stand. Green claims

---

[3] For a more precise definition see DOT 185.137-010 *in* U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm.

[4] For a more precise definition see DOT 187.167-230 *in* U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm.

[5] In its brief, Reliance Standard repeatedly insists that the "General Manager" job description provided by Chuck E Cheese did not include any requirement for kneeling, crouching, or extended standing. Doc. # 20 at 4, 9, 12, 12, 14, 14, 16. This is difficult to reconcile with the plain statement in the document provided by Chuck E Cheese, which specifically lists the "[a]bility to stand, bend, kneel, reach, push/pull, walk and squat" as a "qualification" for the job of General Manager. Doc. # 19-2 at 48-49. The only way the Court can reconcile this statement is to distinguish the "Qualifications" section (under which that requirement is listed) from the "Position Description" and "Job Responsibilities" sections of the document. Reliance Standard's failure to recognize that those physical requirements were a qualification for the job is puzzling nonetheless.

8

that he is totally disabled due to his inability to stand for long periods of time. That is, as frequent standing is a physical demand of both DOT titles, Green argues that an inability engage in this activity results in a total disability under the Plan.

When Green appealed the initial denial of LTD benefits to Reliance Standard, he submitted a letter from Dr. Hope which stated that Green could not perform his prior occupation with Chuck E Cheese due to the required long hours on his feet. Doc. # 19-3 at 67. Furthermore, in Dr. Hope's 1/25/07 evaluation he stated that Green "has recovered well enough for office type jobs but will not be able to tolerate prolonged standing, walking or any kneeling or squatting." Doc. # 21-2 at 4. Based on these two statements, Green asserts that he is unable to perform the frequent standing required by his occupation.

Reliance Standard counters by citing to Green's FCE results and the report of its doctor, Dr. Middledorf. During the FCE, Green was able to perform activities while standing for an hour. Doc. # 19-3 at 51. From a standing position, Green could perform activities higher than 24 inches from the ground without pain for an "unlimited" period of time. *Id.* Additionally, Green was able to walk a mile in just under 16 minutes, and he climbed twelve stairs three times with good balance. *Id.* As a result, Dr. Middledorf opined that Green had "no limits on sitting, standing, or walking...." Doc. # 19-3 at 74. Finally, Reliance Standard points out that Green made no complaints to his doctor about his inability to stand during his 7/31/06 office visit, which coincided with his work stoppage. *Id.* at 6.

While this Court gives great weight to the prognosis of Green's treating physician, it must also recognize that the Plan places the burden on Green to submit satisfactory proof of his disability and gives Reliance Standard discretion in determining whether a claimant is totally disabled. Even if this Court could conclude that Reliance Standard was "wrong" in its determination that Green is not limited from frequent standing, the decision of Reliance Standard was not arbitrary and capricious in light of the FCE results and the opinion rendered by Dr. Middledorf. Reliance Standard may have acted under a conflict of interest by acting as both the insurer and the decision maker, but that one factor is not enough to convince this Court that its decision should be reversed as unreasonable.

## IV. **CONCLUSION**

Reliance Standard's denial of long-term disability benefits to Thomas Green is ***AFFIRMED***.

This 7th day of July 2009.

_____
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA